NOT DESIGNATED FOR PUBLICATION

No. 124,196

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of T.L., A Minor Child.

MEMORANDUM OPINION

Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed December 23, 2021. Affirmed.

*Jeremy Dorsey*, of Kansas Legal Services of Emporia, for appellant natural father.

*Meghan K. Morgan*, assistant county attorney, and *Marc Goodman*, county attorney, for appellee.

Before GREEN, P.J., MALONE and ISHERWOOD, JJ.

PER CURIAM: Father appeals the trial court's decision to terminate his parental rights to his son, T.L. Mother, however, voluntarily relinquished her parental rights to T.L. and does not appeal. Father argues the court erred when it ruled that he was currently unfit and would remain unfit for the foreseeable future. Likewise, Father argues that the court abused its discretion when it ruled that termination was in T.L.'s best interests. The evidence shows that Father has failed to make progress in the case. Drug use has been an overriding concern since the beginning, and Father has continued to use drugs—primarily methamphetamine—throughout the case. Father has also failed to make progress on his assigned case plan tasks. Even though he has shown up for initial evaluations for mental health, anger, and drug and alcohol problems, he has completed none of the programs. His housing situation has also been inconsistent, as he has moved multiple times throughout the case. For a few months in 2020, Father moved to Oregon and did not have any contact with T.L. or the assigned case managers. Even when he had

1

housing, the case managers did not believe those environments would be safe for T.L. Similarly, Father has failed to make progress regarding his visits with T.L. For those reasons, the trial court ruled that Father was unfit and would remain so for the foreseeable future. Viewed from child time, the trial court's conclusion was reasonable. The record also supports the court's ruling that termination was in T.L.'s best interests. For these reasons, we affirm the trial court's judgment terminating Father's parental rights.

FACTS

This case concerns the termination of Father's parental rights to T.L., who was born in 2017. The Kansas Department for Children and Families (DCF) first received a report about T.L. in June 2018. The report conveyed that Mother, who had a history of drug use, had begun using methamphetamine in front of T.L. DCF received a similar report in January 2019, and a urinalysis test revealed Mother tested positive for methamphetamine that same month. DCF did not take further action on either incident.

But in August 2019, the State filed a child in need of care (CINC) petition for T.L. after receiving a report of a lack of supervision. The report stated that Mother and an unrelated third party had been swinging a sledgehammer outside, which created debris close to T.L. While that happened, Mother and the unrelated third party did not notice T.L. in the street.

On August 19, 2019, Kaylie Smith, a Child Protective Services Specialist, met with Mother and Father to discuss the allegations. Mother acknowledged being at the person's residence but denied the other allegations. She said nobody swung a sledgehammer and T.L. had not been in the street. Despite Father not being present when the alleged events occurred, Smith requested that Mother and Father both perform urinalysis testing because of previous reports of methamphetamine use. They both agreed, but neither one completed the tests.

2

On August 21, 2019, Smith contacted the Emporia Police Department to perform a welfare check on T.L. Nobody contacted Mother, Father, or T.L. on the initial attempt. On a second attempt later the same day, a police officer contacted T.L. but did not contact Mother or Father.

On August 22, 2019, Smith met with Mother, Father, and T.L. Smith expressed concerns about methamphetamine use and Mother and Father failing to complete the requested urinalysis tests. Father became upset with Smith's concerns because he had not been present when the alleged incident took place and went outside. Smith asked Mother about her drug use, and Mother denied current methamphetamine use. Mother stated she had used the prior week, but she denied doing so in front of T.L. Mother also said Father had not been using. Based on previous reports and recent drug use, Smith told Mother something needed to change and suggested Family Preservation services. Smith observed sores on Mother's face, arms, and legs, and called the Emporia Police Department later that day for another welfare check based on the erratic behavior of Mother and Father.

Law enforcement arrested Mother and Father, who were both on probation and had warrants, after going to their apartment. Law enforcement placed T.L. in police protective custody that same day. On August 23, 2019, the Stated filed the CINC petition. On August 26, the trial court entered a temporary custody order and placed T.L. in temporary DCF custody. The same day, the court appointed Brian Williams to serve as guardian ad litem (GAL) in the case. After an adjudication hearing in September 2019, the court adjudicated T.L. as a child in need of care and ordered him to remain in DCF custody.

That same month, Saint Francis Community Services (SFCS) met with the parents to discuss case plan tasks. SFCS ordered both parents to obtain appropriate and safe housing, complete various parenting classes, ensure parties around T.L. submit to background checks and be approved by SFCS, complete anger assessments, complete

drug and alcohol assessments, maintain employment, submit paystubs to SFCS every month, complete a budget, submit to random drug testing, complete mental health assessments, and have no negative law enforcement contact. SFCS also ordered Father to complete a background check.

In November 2019, the trial court appointed a court-appointed special advocate volunteer to T.L.'s case. Later that month, Mother and Father moved to a new residence. A SFCS worker completed a walk-through of the home and determined it met minimal standards to be suitable for T.L. At that time, the parents' visits with T.L. were in the community. But soon after, Mother told SFCS Father had been using drugs and moved out of the house. Visits were then moved back to the SFCS offices. Father did not answer the door when SFCS attempted a drop-in visit the next day. In December that same year, SFCS met with Father in his home, and he denied using drugs. But SFCS administered a mouth swab during the meeting, which tested positive for methamphetamine. SFCS had been unable to contact Father since December 31. SFCS tried to reach him multiple times throughout January 2020, but he did not return phone calls or answer the door when SFCS visited.

At the end of a permanency hearing in November 2020, the trial court found that reintegration was no longer a viable option. Instead, the court found that T.L.'s best interests would be served through adoption. Thus, the court ordered the State to file a motion for finding of unfitness and termination of parental rights, which it did in January 2021. In April 2021, Mother voluntarily relinquished her parental rights.

In May 2021, the trial court held the termination hearing. Staci Trujillo, an intake and parent support worker for SFCS, testified. She performed the intake with Father when T.L. went into DCF custody in August 2019. During the initial intake meeting, Father told Trujillo he felt depressed but did not reveal whether a doctor prescribed any medication for depression. Instead, Father said he used tetrahydrocannabinol (THC) to

4

medicate, which would explain why he would test positive for that substance. Father also told Trujillo he last used methamphetamine in November 2018. Trujillo did not remember testing Father for either substance, but she passed along Father's statements to his case worker.

Lindsay Metcalf, the initial permanency specialist with SFCS, worked on the case from August 2019 to April 2020. Metcalf said that Father participated in the initial case plan task meeting and understood the assigned case plan tasks. While she worked on the case, Father did not have appropriate housing. Along with residing with other people, Metcalf had concerns with how cluttered and unclean Father's home had been. Metcalf also believed the amount of cigarette smoke in the house rendered it a safety risk for T.L. Father told Metcalf he understood her concerns, but he failed to address it by the time Metcalf visited again.

Metcalf said Father did not complete an anger assessment, mental health intake, drug and alcohol evaluation, or maintain employment. Father intermittently completed the random drug tests, which typically tested positive. Metcalf discussed treatment with Father multiple times, but she did not believe Father to be in a place where he could have stopped using even though he wished to.

Because Father could not refrain from drug use, SFCS did not allow Father to have unsupervised visits with T.L. Thus, Father's visits were either supervised or monitored when he visited. When visits occurred, Metcalf said Father did very well. In her opinion, T.L. had a very strong bond with Father. That said, Metcalf said Father failed to consistently visit T.L. Metcalf said there would be chunks of time Father would visit before he would stop doing so. Similarly, Father failed to consistently maintain contact with SFCS. Near the end of her involvement with the case in April 2020, Father had stopped visiting T.L. and stopped communicating with SFCS.

On cross-examination, Metcalf discussed Father's housing. She believed he owned a trailer and had his name on a lease with an apartment but did not own any of the other residences she visited. She said the apartment that Father leased had problems. As for Father's parenting skills during his visits, Metcalf said Father acted appropriately. She did not have any safety concerns aside from his drug use, and T.L. enjoyed himself while visiting Father. As to case plan tasks, Metcalf said Father completed a single parenting class but failed to make progress on any of the other tasks.

Erin Welch, the SFCS permanency specialist who worked on T.L.'s case after Metcalf, also testified. Welch said she worked as the case manager from June 2020 to February 2021. Welch did not have contact with Father until October 2020, even though she sent him monthly letters, called his last known phone number, sent him text messages, and searched for him on Facebook. At some point, Mother told Welch that Father had moved away from Kansas, but Welch did not know which state Father moved to.

After Welch contacted Father, she reiterated the case plan tasks assigned and explained urgency with which he needed to make progress on the tasks. Since he had failed to make progress, the case plan tasks assigned when Metcalf managed the case remained the same. Father eventually scheduled a mental health intake and anger assessment while Welch managed the case, but he missed the appointment and failed to complete those tasks. Likewise, he failed to obtain appropriate housing, complete parenting classes, complete a budget, and failed to submit the necessary documentation to support case plan tasks. Welch believed Father obtained employment sometime around January 2021, but Father never provided Welch with any pay stubs. Welch said Father consistently submitted to drug testing, but he continued to test positive for methamphetamine.

Once Welch contacted Father, visits resumed in October 2020. Welch said the visits went well, and Father showed up to most of the visits, only occasionally missing them. Welch believed Father to be able to parent T.L., and Father would cook meals and bring them to visits. Even so, the visits were supervised because Father failed to make progress on the assigned case plan tasks.

On cross-examination, Welch said Father consistently met with her each month after October 2020 to discuss the case plan tasks. Father asked Welch to remind him of the tasks he needed to complete, which she did. Even so, Father failed to make progress on those tasks while Welch managed the case. Welch also reiterated her belief that T.L. and Father had bonded. But again, Welch would not move the visits from supervised to monitored because Father's drug tests were not clean.

The GAL also asked Welch about Father's visits with T.L. Welch stated Father would visit T.L. once per week for about an hour. She also explained that every parent starts with supervised visits before progressing to other forms. When asked how somebody could move from supervised to monitored visits, Welch said she generally made a person test clean three consecutive times. Father had occasionally tested clean one time but had never been able to test clean two consecutive times, consistently testing positive for methamphetamine. To his credit, Father would tell Welch he would test positive for the drug instead of trying to lie about it.

Additionally, Kathy Fuller, another SFCS permanency specialist, testified. She started serving as case manager in March 2021 and continued in that role at the time of the termination hearing in May. During that time, she only worked on case plan tasks previously assigned. Like the testimony of previous case managers, Fuller said Father had not completed parenting classes, an anger management assessment, a mental health intake, or a drug and alcohol evaluation. Father told Fuller he began looking for a new house, but Fuller did not know whether Father moved into a new residence. Father also

7

told Fuller he began working, but he failed to provide her with any pay stubs to verify that claim. Fuller stated that Father sporadically submitted to random drug tests, which had tested positive for methamphetamine. Despite Fuller's discussions with Father about drug and alcohol treatment, Father had not participated.

Fuller said Father had only missed one visit with T.L. while she had been case manager. The visits had also gone well, and T.L. recognized Father when he visited. Father had also been receptive to Fuller's recommendations regarding how to handle certain situations during visits. That said, the visits remained monitored because Father tested positive for drug use.

On cross-examination, Fuller said Father failed to confirm his visit in time, which explained Father's one missed visit. Since then, Father had consistently confirmed visits several hours in advance. During visits, Father paid attention to T.L., and Fuller believed the two had bonded. Father's only struggles during visits occurred when T.L. would have a tantrum. Fuller said Father did not ignore T.L. when those instances occurred, but he did not always know how to respond. Sometimes Father asked Fuller for direction, which she would provide. She said she would not feel comfortable allowing Father to take T.L. for 24 hours based on his drug use and lack of parenting skills.

Jennifer Billet, a reintegration supervisor with SFCS, testified after Fuller. Billet said she supervised the case, as well as the workers involved in the case, since its inception. She also managed the case during a brief period when a case manager had not been assigned. During her involvement with the case, Billet said Father failed to complete case plan tasks. Her overarching concerns in the case had been Father's drug use and lack of consistency maintaining contact with T.L. Billet explained that Father had three to four gaps of time when he failed to maintain contact with T.L. since the case began.

8

When asked about Father's relationship with T.L., Billet agreed that it could be described as more of a play friend or partner relationship rather than a parent child relationship. Though she had not directly supervised Father's visits, Billet said the staff made her aware of concerns with Father's parenting skills. As for drug use, Billet essentially made the same statements as the case managers. Like the case managers, Billet did not believe Father could parent T.L. without completing drug and alcohol treatment. In Billet's opinion, Father's failure to complete treatment contributed to his overall history of inconsistency. Billet said SFCS tried to help Father get treatment to no avail. Similarly, Billet said SFCS provided Father with the necessary information and would have offered Father financial assistance to get treatment if he asked. In sum, Billet did not believe T.L. could reintegrate to Father's home anytime soon because he failed to make the progress necessary for this action to take place.

On cross-examination, Billet said Father reported that he completed a drug and alcohol assessment in November 2020 but failed to provide proof. Aside from that, Father never reported going back for further treatment. As for visits, Billet stated that for a two-week period near the beginning of the case, Mother and Father had unsupervised visits twice per week in the community. But the visits were moved back to SFCS after that period due to concerns about the parent's drug use. Since then, all of Father's visits took place at SFCS. At no point did Billet recall anyone expressing any concern that Father would physically harm T.L. Instead, she reiterated that Father's drug use, lack of completed case plan tasks, and inconsistency maintaining contact with T.L. were his primary barriers to making progress in the case.

Lastly, Father testified. He said he moved into a new residence shortly before the hearing, which he leased for a year. He had yet to furnish the residence. After advising Fuller of his new residence, Father said she performed a walk-through and told him what he would need to make it safe for T.L. Those items included a carbon monoxide monitor, fire alarm, baby gates, covers for the electrical outlets, and baby-proof locks. At the time

9

of the hearing, Father said he made all necessary safety improvements, except for buying baby gates.

He also said he worked at Hostess, Inc. He originally got the job though a temp agency but had worked there long enough that Hostess wished to hire him directly, pending a drug test. He had yet to take the drug test but planned to do so as soon as possible. If Hostess hired him full-time, he would have health insurance, which he did not have at the time of the hearing.

Father stated his most recent visit with T.L. occurred the Monday before the hearing. Father brought T.L. dinner during the visit, and he said T.L. enjoyed what he brought. Since reestablishing contact in October 2020, Father said he had only missed one visit, which he said Fuller could verify. During visits, Father would often play with toys or roughhouse with T.L., which he said T.L. liked to do as opposed to watch movies.

When asked about moving out of state, Father said he lived in Oregon. Just before moving, Mother divorced him, and Father believed moving away would give him the best chance to get in the right mindset to ultimately get T.L. back. He assumed Mother would have custody of T.L. shortly after he left because of her progress on the case plan tasks. Nevertheless, after speaking with her, he learned he had been mistaken and returned to Kansas so he would have the chance to get custody himself.

Throughout the case, Father said he completed two initial evaluations. He said he did a combined anger assessment and drug and alcohol evaluation first. But he did not provide SFCS with proof the evaluation took place, nor did he attend a second meeting. As a result, he had to do a second initial evaluation. He believed the second evaluation recommended either 25 weeks or 6 months of treatment, but he failed to attend a second meeting. He attributed this failure to his inconsistency with scheduling and the company that performed his initial evaluation changing where he would receive treatment. Father

stated that he would be willing to engage in drug and alcohol treatment. When asked why he had failed to do so previously, Father said he had little support in his life, leaving him to do everything himself.

As to other case plan tasks, Father said he had had no negative law enforcement contact, was not on probation or parole, and did not have any active criminal cases. He attended one parenting class but failed to go the second week because he showed up more than 30 minutes after it started. If given the opportunity, Father said he would be willing to engage in parenting classes.

Father said he loved T.L. and had a strong bond with him. When asked why the trial court should not terminate his parental rights, Father stated:

> "I—I don't know how many characteristics out of a list you have to point out to show that you're a good parent, but I may not reach the requirement, but the few things that I did bring to the table I knew that I could make up for everything else in time. There's nothing I don't want him to have in this life. There's nothing I wouldn't try to give him if I could.
> "I just want to give him something I never had and that was a dad that actually wanted to be there and acted like he cared. It's something that every man specifically looks for as an adolescent is a dad that can help bond with them and lead them down the right path instead of just trying to wing it. And I knew I'd give him a better upbringing than I had. I wish I had the opportunity."

On cross-examination, Father said he and Mother had split custody of T.L. but did not have a custody agreement prior to T.L. being place in DCF custody. Father said he acted as primary care holder for T.L. for stretches of time when Mother spent time in jail. During those times, Father said his stepdad "basically carried me while I was not living up to how old I was. I mean, I'm 22 and there was points when I was over 18 and still living at home."

As for drug use, Father acknowledged it had been a consistent problem throughout the case. He said he could not provide a clean urinalysis test the day of the hearing, stating it would test positive for THC. He said he most recently used THC a couple of weeks before the hearing and last used methamphetamine a couple of months before the hearing. SFCS asked Father to do a drug test when he visited T.L. the previous Monday, but Father did not perform the test because he did not think he could make it to the testing facility in time. Had he shown up late, the facility would have considered the test positive.

When asked why he went to Oregon, Father said he had family there that would not have been a bad influence. If given the choice, Father would not have returned to Kansas after moving to Oregon, but he returned to try to get custody of T.L. While in Oregon, he did not try to reach out to SFCS to ask whether he could work on his case plan tasks. Relying on the advice of others outside the situation, he did not think SFCS would assist him in completing his plan tasks. Father also said he did not know free mental health services were available. Similarly, he did not ask SFCS to help pay for other programs or services. Father acknowledged he needed drug treatment and anger services, which SFCS stressed throughout the case. He reiterated that he had done two initial evaluations but failed to follow up on either.

On redirect, Father stated he made progress with the Batterer's Intervention Program multiple times but failed to fully complete the course. He took part in that program either just before T.L. being born or soon after. He took the course as part of a probation requirement. He also conveyed his willingness to undergo an additional domestic violence screening and follow recommendations.

In closing, the State asked the trial court to terminate Father's parental rights. The State did not doubt that Father loved T.L., but it pointed to Father's lack of progress on the case plan tasks since the case began in August 2019. Because he failed to complete

case plan tasks, his visits with T.L. remained supervised or monitored throughout the entire case, except for the very beginning. Likewise, Father never addressed his continued drug problems and consistently tested positive for methamphetamine. Due to these facts, Father had not had a chance to parent T.L., and the State did not believe Father could make the necessary changes in his life in the foreseeable future.

In response, Father focused mainly on the foreseeable future. He argued it would be possible to change his behavior. He also pointed to the fact that he recently obtained employment, signed a lease, and had a walk-through of his new residence. Father also pointed to his expressed willingness to engage in treatment and other services. In sum, Father believed it would be too early to terminate his parental rights based on his recent changes.

The GAL's closing echoed the concerns expressed by the State. The GAL acknowledged Father had recently made positive changes in his life, but he cast doubt on Father's continued success. For example, the GAL pointed to Father's testimony about having to pass a drug test to get hired full-time at Hostess and compared it to Father's later testimony about not being able to pass a drug test on the day of the hearing. Similarly, the GAL stated that Father had previously expressed willingness to engage in treatment and services but never followed through past the initial evaluation. Thus, the GAL did not believe Father could make the necessary changes in the foreseeable future and supported the State's motion.

After hearing arguments, the trial court reviewed the evidence presented. Next, the court pointed to the factors listed in K.S.A. 2020 Supp. 38-2269(b) it must consider in termination cases. The court found the evidence supported termination under multiple factors. Specifically, Father's continued drug use, his failure to engage in mental health services, the failure of reasonable efforts made by SFCS to rehabilitate the family, Father's inability to adjust his circumstances to meet T.L.'s needs, and the fact that T.L.

13

had been out of the home for 15 of the last 22 months of his life. The court believed Father's problems related mainly to his inability to stop using drugs. Because of this, the court did not believe Father could make the required changes in the foreseeable future and pointed out that time should be considered from T.L.'s perspective. As a result, the trial court found it was in T.L.'s best interests to terminate Father's parental rights. The court later filed a journal entry memorializing its findings.

Father timely appeals.

ANALYSIS

*Did the trial court err in determining Father was unfit to parent T.L. and terminating his parental rights?*

On appeal, Father argues the trial court erred when it terminated his parental rights. Specifically, Father contends there was insufficient evidence to support the court's decision.

A parent has a constitutionally recognized right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*). The right is a constitutionally protected liberty interest. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (fundamental liberty interest). Accordingly, the State may terminate the legal bond between a parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2020 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, this court must determine, after reviewing all the evidence in a light most favorable to the State, whether a rational fact-

finder could have found the determination to be highly probable, that is, by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. at 705-06; *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). In making this determination, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

Under K.S.A. 2020 Supp. 38-2269(a), after a child has been adjudicated as a CINC, in order to terminate a parent's rights the State must prove by clear and convincing evidence a parent "is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The statute provides trial courts with a nonexclusive list of nine factors to consider when determining unfitness. K.S.A. 2020 Supp. 38-2269(b). Clear and convincing evidence of a single statutory factor under K.S.A. 2020 Supp. 38-2269(b) can be a sufficient basis for a trial court's determination that a parent is unfit. K.S.A. 2020 Supp. 38-2269(f).

The trial court here ruled that the evidence supported termination of Father's parental rights under K.S.A. 2020 Supp. 38-2269(b)(1), (b)(3), (b)(7), (b)(8), and (b)(9). Each factor is analyzed below.

*K.S.A. 2020 Supp. 38-2269(b)(1)*

A trial court may terminate a parent's rights to his or her child if there is clear and convincing evidence of "[e]motional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child." K.S.A. 2020 Supp. 38-2269(b)(1).

15

While doing his initial intake with Trujillo, Father reported struggles with mental health and said he used THC to medicate himself instead of prescribed medication. Trujillo passed this information to his case managers, and SFCS ordered Father to complete an anger assessment, drug and alcohol assessments, and mental health assessments as part of his case plan tasks. His failure to complete those tasks led the trial court to conclude that the evidence supported termination under K.S.A. 2020 Supp. 38-2269(b)(1).

During the termination hearing, Metcalf testified that Father did not complete an anger assessment or a drug and alcohol evaluation. Welch said Father had scheduled a mental health and anger evaluation, but he missed the appointments and failed to complete those tasks while Welch worked as case manager. Similarly, Fuller stated that Father failed to complete an anger assessment, drug and alcohol evaluation, and mental health intake.

Father disagreed with the case managers' testimony. Father testified he completed two initial drug and alcohol evaluations. During his first evaluation, Father said he performed an anger evaluation simultaneously with his drug and alcohol evaluation. But he acknowledged that he never attended a second meeting, and he could not say with certainty whether he provided SFCS with proof of his completed evaluations. In like manner, he said he did not attend a second meeting after completing his second evaluation, though he did reveal he would be willing to engage in future mental health treatment. Father's conflicting testimony, and his willingness to engage in future mental health treatment is the basis of his argument on appeal on this point.

While it is true that Billet testified that Father told SFCS he completed a drug and alcohol assessment in November 2020, she also testified Father failed to provide the proof of that assessment. Additionally, like Father, Billet stated Father never reported going back after the initial assessment to receive further treatment. Thus, Father's lack of

16

engagement with mental health services remained constant throughout everyone's testimony at the termination hearing.

In making his argument, Father essentially asks us to reweigh the evidence the trial court considered when making its ruling. But that is not the function of our court on appeal. *In re B.D.-Y.*, 286 Kan. at 705. In sum, the evidence showed that Father failed to complete case plan tasks related to mental health. As a result, the trial court did not err by relying on K.S.A. 2020 Supp. 38-2269(b)(1) when terminating Father's parental rights.

*K.S.A. 2020 Supp. 38-2269(b)(3)*

A trial court may also terminate a parent's rights to his or her child if there is clear and convincing evidence that "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." K.S.A. 2020 Supp. 38-2269(b)(3).

The trial court relied heavily on this factor, even deeming it "the controlling factor in this case." Father does not dispute the testimony regarding his drug use. Instead, he relies on his testimony that he would be willing to engage in drug treatment and the fact he complied with requested drug testing most of the time. Neither contention is convincing.

As stated earlier, SFCS had concerns about Father's drug use from the beginning of the case. In August 2019, Smith met with both parents and requested they complete urinalysis tests because of previous reports of methamphetamine use. Neither one complied. A few days later, police officers with the Emporia Police Department arrested Mother and Father on outstanding warrants and took T.L. into DCF custody.

In November 2019, Mother and Father moved into a residence together. Less than a week later, Mother told case workers she believed Father had been using drugs and moved out. Since then, Father—when he completed requested drug testing—consistently tested positive for methamphetamine.

Metcalf, Father's initial case manager, said Father intermittently complied with drug testing requests. When he did, Father typically tested positive for either THC or methamphetamine. Welch said Father usually submitted to drug testing, which she would typically do once every week, or once every other week, following visits with T.L. Though Father agreed to take the tests, he would test positive for methamphetamine. Welch also said Father had never been able to provide consecutive clean tests. In the same way, Fuller said Father tested positive for methamphetamine when he submitted to drug testing, something he did not always do. All of them discussed the importance of drug treatment and sobriety with Father if he hoped to regain custody of T.L. Despite these conversations, Father never engaged in treatment.

Additionally, on the Monday before the termination hearing, Father failed to complete a requested drug test. And on the day of the hearing, Father stated he would most likely fail a urinalysis test if one had been given, though he attributed blame to THC rather than methamphetamine this time, saying he last used methamphetamine a couple of months before the hearing. But Father's testimony regarding drug use is unverified because he failed to complete the requested drug test earlier that week.

Father's testimony regarding a willingness to engage in treatment is also contradicted by his actions throughout the case. Even though he testified he completed an initial evaluation twice, he also testified he failed to return to treatment facilities after doing so. These actions, paired with a consistent inability to test clean, show that Father did not take the necessary steps to control his drug problems.

In sum, the evidence showed Father had a drug problem that rendered him unable to care for T.L. As such, the trial court did not err by relying on K.S.A. 2020 Supp. 38-2269(b)(3) when terminating Father's parental rights.

*K.S.A. 2020 Supp. 38-2269(b)(7)*

Also, a trial court may terminate a parent's rights to his or her child if there is clear and convincing evidence that the reasonable efforts made by public or private agencies to rehabilitate the family have failed. K.S.A. 2020 Supp. 38-2269(b)(7). "The language in K.S.A. 2019 Supp. 38-2269(b)(7) imposes an obligation upon the relevant social service agencies to expend reasonable efforts toward reintegrating the child with his or her parents." *In re A.P.*, No. 121,913, 2020 WL 3022868, at *10 (Kan. App.) (unpublished opinion), *rev. denied* 312 Kan. 891 (2020). This requirement provides a parent with an opportunity to succeed, but to do so requires the parent to exert some effort. *In re. A.P.*, 2020 WL 3022868, at *10 (citing *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 [2019]).

The trial court deemed the case plan tasks assigned by SFCS and DCF to be reasonable. The court recognized that the agencies required Father to complete numerous case plan tasks to reintegrate T.L into his home. And after making those requirements, the agencies sought to help Father complete them.

Father does not challenge the trial court's findings that SFCS and DCF expended reasonable efforts to rehabilitate the family. Instead, he disputes some of the agencies' conclusions regarding his level of participation. Without any argument challenging the trial court's conclusions about K.S.A. 2020 Supp. 38-2269(b)(7), we deem the argument waived. See *In re Adoption of T.M.M.H.*, 307 Kan. 902, 912, 416 P.3d 999 (2018) ("'Where the appellant fails to brief an issue, that issue is waived or abandoned.'").

19

*K.S.A. 2020 Supp. 38-2269(b)(8)*

Moreover, a trial court may terminate a parent's rights to his or her child if there is clear and convincing evidence there is a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 2020 Supp. 38-2269(b)(8).

As stated earlier, SFCS ordered Father to obtain appropriate and safe housing, complete parenting classes, submit to a background check, ensure other parties around T.L. submit to background checks and be approved by SFCS, complete an anger assessment, complete drug and alcohol assessments, maintain employment, submit paystubs to SFCS every month, complete a budget, submit to random drug testing, complete mental health assessments, and have no negative law enforcement contact. The trial court ruled that Father failed to comply with these requirements.

The issues surrounding Father's drug use were discussed in the preceding sections and need not be recounted. Likewise, the issues concerning Father's mental health and anger assessments have also been discussed. Thus, the only issues not discussed have been Father's parenting classes, housing, and employment.

Father argues that he recently obtained appropriate housing and tried to make the residence appropriate for T.L. He also argues he rebutted the case managers' testimony that he failed to complete parenting classes. Also, he asserts the case managers' testimony regarding his lack of parenting skills conflicted. And lastly, he asserts he had a job at Hostess that had the potential for full-time employment.

Metcalf and Welch both testified Father did not have appropriate housing while they worked as case manager. Throughout their time as case manager, they said Father moved a few times and had been living with other people. When they inspected those

residences, neither believed any of them were appropriate for T.L. Metcalf said Father stopped communicating with SFCS towards the end of her time as case manager in April 2020. Welch, who took over as case manager in June 2020, said she did not have contact with Father until October that same year. During that time span, Father lived in Oregon. Fuller, who started working as Father's case manager in March 2021, said Father did not have appropriate housing when the termination hearing occurred. She knew he looked at a new residence just before the hearing, but she did not know if he had moved into it yet.

Instead of disputing this testimony, Father focuses on the fact he leased a new residence shortly before the hearing. Though he testified he recently bought most of the supplies Fuller deemed necessary for the residence, he did not convey whether Fuller had returned to the residence to verify those purchases or reinspect the residence. So, none of the residences the case managers inspected had been deemed appropriate throughout the case, except in the very beginning.

Father's two arguments concerning parenting classes are also unpersuasive. First, Father contends he rebutted the case managers' testimony that he failed to complete parenting classes. Metcalf stated that Father completed a parenting class through the agency, and she believed he provided a certificate of proof. But the case plan stated that Father would have to complete a variety of parenting classes and submit certificates of proof to SFCS. By his own admission, Father stated that he completed the first class but attended no others.

Father also contends the testimony from case managers about his parenting skills conflicted. But it is unclear what he wants us to take from that argument because he does not dispute the reasonableness of the case plan tasks assigned by SFCS. Without explicitly saying so, it seems Father is trying to maintain that the parenting classes were unnecessary because the case managers did not report any problems Father had during his visits with T.L. If this is Father's position, this position begs the question. For one thing,

21

the testimony of the case managers showed that Father needed to develop his parenting skills. As an example, when T.L. would act out inappropriately during Father's visitation with him, Father would have to ask for help from one of the case managers to correct T.L.'s behavior. Thus. Father's position is inconsistent with the evidence in the record. The evidence shows that Father needed parenting classes.

All the case managers testified the visits with T.L. generally went well. But they also testified to varying amounts of consistency concerning how often Father would show up to the visits. Metcalf said, "Visits were very inconsistent. [Father] would have chunks of time where he would attend visits and then visits would just stop because we would not be able to get ahold of him or he'd show up late or wouldn't show up." Welch said that once Father returned from Oregon in October 2020, he began attending visits with T.L. Welch described Father as relatively consistent, only occasionally missing scheduled visits. And Fuller said Father only missed one visit while she worked as case manager.

But more concerning, from their point of view, was the fact that Father's visits never progressed to the point where he could spend more than an hour with T.L. Since the visits always took place at SFCS, the case managers always observed Father parent T.L. in controlled environments. This meant they did not have a chance to observe Father parenting in more realistic situations in which to evaluate Father's parenting skills. They also said Father sometimes struggled when T.L. acted in a way that required him to correct T.L.'s behavior, though they stated Father would follow their recommendations on how to handle those situations.

As for employment, Metcalf said Father did not maintain employment while she worked as the case manager. Welch said Father told her he got a job sometime around January 2021, but he failed to provide her with any pay stubs to verify the claim. Similarly, Fuller believed Father had a job, but he failed to provide her with any pay stubs.

Father testified he had been working at Hostess. He said Hostess would be willing to hire him full-time if he could pass a drug test, which he needed to take as soon as possible. If he could get the full-time position, his pay would allow him to obtain health insurance, which he did not have when the hearing was held. But the GAL cast doubt on Father's full-time prospects because of his drug use. Since, by his own admission, Father most likely could not have passed a drug test on the day of the hearing, the GAL did not believe Father could pass the requisite drug test required to get the full-time position at Hostess.

Taken as a whole, the evidence showed that Father did not complete most of his assigned case plan tasks. For some of the tasks, Father completed initial evaluations but failed to comply with the recommendations for further treatment. Thus, Father failed to adjust his circumstances to meet T.L.'s needs, and the trial court did not err by relying on K.S.A. 2020 Supp. 38-2269(b)(8) when terminating Father's parental rights.

*K.S.A. 2020 Supp. 38-2269(b)(9)*

Lastly, the trial court relied on K.S.A. 2020 Supp. 38-2269(b)(9), which states:

"(b) In making a determination of unfitness the court shall consider, but is not limited to, the following, if applicable:

. . . .

"(9) whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home."

As stated earlier, the State removed T.L. from his home in August 2019. The termination hearing took place in May 2021. T.L. remained in the State's custody during this entire period. Father concedes to this time frame in his brief.

However, K.S.A. 2020 Supp. 38-2269(b)(9) requires more than just a sufficient amount of time that the child has been in out-of-home placement with DCF, the statute requires that at least one of the factors set out in K.S.A. 2020 Supp. 38-2269(c) apply to the facts of the case. The trial court failed to make a finding as to which factor under K.S.A. 2020 Supp. 38-2269(c) applied to this case in its order of termination from the bench or in the written journal entry of termination of parental rights. But Father has not recognized or briefed this failure and so has waived or abandoned the issue. *In re Adoption of T.M.M.H.*, 307 Kan. at 912.

Nevertheless, even if Father had made an appropriate challenge, it was doomed to fail. A review of the record as a whole contains clear and convincing evidence that Father failed "to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home" under K.S.A. 2020 Supp. 38-2269(c)(3). Thus, the trial court did not err when applying K.S.A. 2020 Supp. 38-2269(b)(9) to the case.

Considering the entire record, there is clear and convincing evidence supporting each of the factors the trial court relied on when terminating Father's parental rights.

*Father's conduct or condition is unlikely to change in the foreseeable future*

In addition to determining whether a parent is presently unfit, a trial court must also determine whether the conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a).

"When assessing the foreseeable future, this court uses 'child time' as a measure. The Revised Kansas Code for Care of Children—K.S.A. 2018 Supp. 38-2201 et seq.—recognizes that children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward a prompt, permanent disposition. K.S.A. 2018 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ('"child time"' differs from '"adult time"' in care proceedings 'in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's')." *In re M.S.*, 56 Kan. App. 2d at 1263-64.

Based on Father's lack of progress throughout the case, the trial court concluded he could not make the necessary changes in his life in the foreseeable future. The court also noted that T.L. had been in DCF custody since August 2019. Father believes the court erred in concluding he could not make the necessary changes, given that he recently obtained housing, took steps to ensure the housing met safety standards, and obtained a job.

To recap, T.L. was born in 2017. DCF removed him from his parent's home in August 2019, and he remained in DCF custody until the termination hearing in May 2021. Thus, T.L. had spent more than half of his life out of his parent's custody before the trial court terminated Father's parental rights.

Also, the glaring issue in the case is Father's drug use. The trial court believed "that if [Father] had that situation under control, the other case plan tasks would fall into place very quickly. But it's been two years and we haven't got it under control." And aside from conveying a willingness to engage in treatment, Father presented no evidence to dispute the court's conclusion. So, the trial court correctly concluded that his drug use hampered his ability to make progress in the case.

For example, due to Father's inability to refrain from drug use, his visits with T.L. have always been at SFCS, except in the very beginning of the case. Because of this, Billet did not believe T.L. could reintegrate into Father's home in the foreseeable future. When asked why, she explained:

> "Because [Father] is not prepared to have [T.L.] into his home now. You know, when you're having restricted visits such as an hour at an office, you're not able to progress to—to show that you can parent the child in your own home environment and to meet those needs beyond an hour.
> "So before we would even be able to begin to look at reintegration, we'd have to be increasing visits, having them in the community, in the home."

Metcalf and Fuller echoed similar sentiments, stating they did not believe Father could parent T.L. because he failed to address his drug use. Likewise, the GAL did not believe Father could make the necessary changes in the foreseeable future based on his drug use. As stated earlier, the GAL doubted whether Father would be hired full-time at Hostess. This led the GAL to doubt the sustainability of the recent positive changes Father had made.

In short, Father's overarching problem in the case is his drug use. By the termination hearing, nearly two years had passed since DCF took custody of T.L. Throughout the case, Father has consistently shown he is unable to refrain from drug use and would not consistently engage in any treatment. Indeed, Father admitted that he self-medicated his depression problem by using THC. As a result, Father would be unable to reintegrate T.L. into his home in the foreseeable future, especially when viewed in "child time." The best indicator of future performance is past performance. Accordingly, a trial court can consider a parent's past history as evidence regarding the reasonable likelihood of any future change in a parent's fitness. *In re M.S.*, 56 Kan. App. 2d at 1264; see *In re Price*, 7 Kan App. 2d 477, 483, 644 P.2d 467 (1982). Thus, the trial court did not err by

concluding Father's conduct or condition is unlikely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a).

*Did the trial court abuse its discretion in concluding termination was in T.L.'s best interests?*

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2020 Supp. 38-2269(g)(1). This decision is within the sound discretion of the trial court, and the trial court makes that decision based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d at 1115-16.

An appellate court reviews the trial court's decision for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d at 1116. A trial court exceeds its broad latitude if its ruling is based on an error of law, an error of fact, or is arbitrary, fanciful, or unreasonable. *In re R.S.*, 50 Kan. App. 2d at 1116. Since Father does not point to an error of law or fact, the question becomes whether no reasonable trial court would come to the same conclusion. See *In re R.S.*, 50 Kan. App. 2d at 1116.

To support his argument, Father relies on essentially the same arguments presented earlier. He contends he and T.L. had a strong bond, he tried to comply with the case plan tasks, the testimony from the State's witnesses conflicted, and he shared a willingness to comply with treatment. But the evidence belies Father's claims, apart from his claim about having a strong bond with T.L.

The record shows that when the termination hearing occurred, T.L. had been in DCF custody for approximately 21 months—slightly more than half of his life—since

being removed from Father's home. The record also shows that Father failed to stop using drugs and failed to engage in treatment for those issues. In like manner, Father failed to adequately progress on other case plan tasks. Though Father purportedly made progress on some tasks, he failed to provide SFCS or DCF with proper documentation to verify such progress. Nor could Father articulate to the trial court how anything would be different if the trial court did not terminate his parental rights. He simply stated he would work harder to prove that T.L. could eventually be reintegrated.

Based on the evidence presented, a reasonable court could conclude that it was in T.L.'s best interests to terminate Father's parental rights.

Affirmed.